## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JADA MCGILL and ANGIE VELEZ,

        *Plaintiffs*,

v.

CITY OF NEW YORK, MAYOR BILL
DE BLASIO, POLICE
COMMISSIONER DERMOT SHEA,
CHIEF OF SUPPORT SERVICES
RAYMOND SPINELLA,
DEPARTMENT OF SANITATION
COMMISSIONER EDWARD
GRAYSON, SUPERVISORY
OFFICER JOHN OR JANE DOE 1,
and OFFICERS JOHN or JANE DOE
2-10,

        *Defendants*.

Civil Action No. _____

Jury Trial Demanded

## COMPLAINT

## INTRODUCTION

In the dead of night on July 22, 2020, armed New York City Police officers in riot gear stormed into City Hall Park where citizens had gathered to peacefully protest the murder of George Floyd.  For a month, protesters, who had renamed the space Abolition Park, encamped with their personal belongings, calling upon the Mayor and New York City government to reduce New York Police Department's (NYPD) budget and to reallocate those funds to necessary social services.  Among them were Plaintiffs Jada McGill, who kept with her an irreplaceable engraved college graduation ring with

1

some of her late grandfather's ashes sealed inside, and Angie Velez, who brought schoolbooks and education supplies to tutor a young child at the park while she protested.

The City gave neither meaningful advance warning of the raid, if any, nor any opportunity for protesters to save their belongings.  Rather, police officers rousted protesters awake in a military-style operation, herded them out of the park under threat of arrest, and ordered them to leave immediately without time to gather their belongings or do anything to protect their property.  The timing and manner of the raid, and the seizure of Plaintiffs' property, were neither random, nor an isolated failure to follow proper procedure.  Rather, it was the result of a deliberate policy on the part of the Mayor, NYPD, and other City officials to break up the protest at Abolition Park and discourage any such future protests.

Plaintiffs have taken every step to regain their property or be compensated for their loss, including timely complying with the City's administrative processes, but to this day the City has neither responded to Plaintiffs' requests, nor given them back their possessions.

Plaintiffs now bring this suit to vindicate their constitutional and common law rights.  They challenge the process New York City officials used to raid the park community and seize and destroy their property as violative of the First, Fourth, and Fourteenth Amendments of the United States Constitution, as well as protections

against conversion, trespass to chattel, and other provisions of New York law.  Plaintiffs seek declaratory relief, compensatory and punitive damages, and attorneys' fees.

## PARTIES

1.   Plaintiff Jada McGill is a resident of New York.  She currently lives in the Bronx with her mother and has resided in New York her entire life, for the last twenty-three years.  Plaintiff McGill first visited Abolition Park on June 23, 2020, and spent many nights there until it was raided by the City.  She was present during the raid, yet received no notice before the police began seizing property and had no opportunity to retrieve her belongings.  Plaintiff McGill's customized ring containing her grandfather's ashes was seized and/or destroyed by City employees.   The loss of Plaintiff McGill's grandfather's remains has caused her feelings of guilt, horror, and an irreplaceable void.  Other belongings of Plaintiff McGill's that were seized and/or destroyed by the City include her identification documents (work ID, passport, driver's permit, state ID), a childhood stuffed animal, a tent, and numerous pieces of clothing.  Without attempting to calculate the personal value of her ring containing her grandfather's ashes, Plaintiff McGill's seized property is valued at approximately $591.50.

2.   Plaintiff Angie Velez is a resident of Brooklyn, New York, and has lived in the state since approximately 2008, for the last fifteen years.   Plaintiff Velez visited Abolition Park frequently beginning on or around June 22, 2020.  She was last at Abolition Park on July 21, 2020, the evening before the police raid.  Although she left only four hours before the police entered the park and began seizing property, at no

point did she receive warning of the upcoming raid.  Because she did not receive notice, Plaintiff Velez was unable to retrieve and remove her property.  At the time police officers forced her and others from the park, they seized and/or destroyed Plaintiff Velez's property worth approximately $660, including two beach chairs, a pair of Beats headphones, an Apple watch, a North Face backpack, an electronic tablet, and school supplies.  Many of Plaintiff Velez's items taken by the City, including the tablet, books, and writing implements, were to help tutor a young boy who frequented the park with his mother.

3.   Defendant City of New York is a municipal entity organized under the laws of the State of New York and maintains its principal office in the County of New York. The NYPD is an agency under the control and operation of the City that is responsible for law enforcement.  The Department of Sanitation is a division under the control and operation of the City that oversees garbage and recycling collection, street cleaning, and snow removal.  The Office of the New York City Comptroller is an agency under the control and operation of the City that manages the property damage and loss claims process, in addition to payroll, procurement, and other financial services for the City.

4.   Defendant Mayor Bill de Blasio, who made the decision to clear Abolition Park, is sued in his official and individual capacity.  At all times relevant to this Complaint, as mayor of the City of New York, he was the chief policymaking official with respect to the City.

4

5.    Defendant NYPD Commissioner Dermot Shea, who helped make and implement the decision to clear Abolition Park, is sued in his official and individual capacity.   At all times relevant to this Complaint, as New York City Police Commissioner, he had final policymaking authority with respect to the NYPD and responsibility for the deployment, training, supervision, and discipline of the police officers under his command who are or were employed by the NYPD.

6.    Defendant NYPD Chief of Support Services Raymond Spinella, who assisted in coordinating the removal and disposal of items after the park's clearing, is sued in his official and individual capacity.   At all times relevant to this Complaint, as Chief of Support Services, he had final policymaking authority to oversee the Fleet Services Division, Property Clerk Division, Central Records Division, and Printing Section.

7.    Defendant Supervisory Officer John or Jane Doe 1, who managed, directed, and oversaw the operation at Abolition Park on July 22, is sued in their official and individual capacity.   At all relevant times, Supervisory Officer Doe was employed by the City.

8.    Defendant Officials John and Jane Does 2-10, who implemented the park's clearing and seized and/or destroyed Plaintiffs' property, are sued in their official and individual capacities.   At all times relevant to this Complaint, Doe officials were employed by the City.

9.    Defendant Department of Sanitation Commissioner Edward Grayson, who assisted in coordinating the removal and disposal of items after the park's clearing, is

sued in his official capacity.  At all times relevant to this Complaint, as Commissioner of the Department of Sanitation, he had final policymaking authority to oversee all Department of Sanitation operations.  On July 22, 2020, the Department of Sanitation provided trucks for official use which resulted in the indiscriminate destruction of community members' belongings and left the rightful owners of such property without recourse.[1]

## JURISDICTION AND VENUE

10.  This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 2201, 28 U.S.C. § 1331, and 42 U.S.C. § 1983 for claims arising under the U.S. Constitution and presenting a substantial federal question.

11.  Supplemental jurisdiction for the state law claims is proper under 28 U.S.C. § 1367(a), as the constitutional issues substantially predominate over the state claims and this petition raises no novel or complex issue of state law.

12.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1), as Defendants are residents of the state in which the district is located, and 28 U.S.C. §

---

[1] Alan Feuer & Juliana Kim, *'Occupy City Hall' Encampment Taken Down in Pre-Dawn Raid by N.Y.P.D.*, N.Y. TIMES (July 22, 2020), https://www.nytimes.com/2020/07/22/nyregion/occupy-city-hall-protest-nypd.html ("But when they went back, everything – their water, clothing and personal effects – had been tossed into sanitation trucks, they said."); *see also* Jen Chung, Jake Offenhartz, & Gwynne Hogan, *"They Ambushed Us": NYPD Clears City Hall Occupation In Pre-Dawn Raid*, GOTHAMIST (July 22, 2020), https://gothamist.com/news/nypd-clears-occupy-city-hall-pre-dawn-raid ("Videos shows police officers with riot shields and tactical gear forming a line on the east side of the encampment, as another group of cops tosses the camp's physical infrastructure into the back of a Department of Sanitation truck.").

1391 (b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## FACTS

13. In the aftermath of the murder of George Floyd in May 2020, advocates calling for the reduction or elimination of NYPD's budget gathered to apply pressure to the City Council and Mayor as they deliberated over plans for the next fiscal year.[2] To ensure their calls for action were geographically proximate, within sight and sound to the decision-makers they sought to influence, activists congregated at the park near City Hall and One Police Plaza.[3] There, exercising their First Amendment rights, protestors called for the elimination of police brutality, defunding of law enforcement in favor of funding other social services, abolition, and additional reforms.

14. Over the course of several weeks, protesters established a community to care for one another at Abolition Park. The community was a vibrant social space, hosting

---

[2] Natalie Colarossi, *Photos show how protesters in New York City are occupying City Hall, demanding the police budget be cut before the July 1 deadline*, BUSINESS INSIDER (July 1, 2020), https://www.businessinsider.in/international/news/photos-show-how-protesters-in-new-york-city-are-occupying-city-hall-demanding-the-police-budget-be-cut-before-the-july-1-deadline/slidelist/76720624.cms.

[3] Feuer and Kim, *supra* note 1 ("The camp, just feet from City Hall, had presented a thorny political problem for Mayor de Blasio. He has been routinely criticized by the demonstrators and his Black supporters since the larger, citywide protests, prompted by the death of George Floyd in Minneapolis, started in late May.").

performances, literary readings, and political discussions to foster the goals of their protest activity.[4]

15. Plaintiff Jada McGill arrived at the park on June 23, 2020. The recent murders of George Floyd and Breonna Taylor had called her to action. Plaintiff McGill wanted to add her voice to the chorus of community members calling for reform or abolition of the NYPD and accountability for police misconduct. Exercising her First Amendment speech and associational rights, Plaintiff McGill joined in the protest activities coordinated by the Abolition Park activists, speaking out against police officers' biased policies and oppressive conduct. She felt immediately at home upon arriving and began staying overnight at Abolition Park to allow her to fully participate with the community of activists.

16. Plaintiff Angie Velez arrived at Abolition Park on June 22, 2020. Plaintiff Velez wanted to join the wave of activism surging throughout the nation and actively participate in local efforts for policing reform in New York City. Plaintiff Velez felt strongly about exercising her First Amendment rights on behalf of victims of police misconduct and abuse, particularly those from marginalized communities most at risk of violence. The provision of mutual aid assistance and resources to those in need, as

---

[4] Amba Guerguerian, *Meet New York City's Newest Neighborhood: Abolition Park*, INDYPENDENT (July 14, 2020) (noting participants "attended teach-ins, watched film screenings, took off on marches and participated in discussion groups and assemblies"); Juliana Kim, *How the Floyd Protests Turned Into a 24-Hour 'Occupy City Hall' in N.Y.*, N.Y. TIMES (June 28, 2020), https://www.nytimes.com/2020/06/28/nyregion/occupy-city-hall-nyc.html.

well as the collaborative and inclusive environment, established a strong sense of community for those present, including Plaintiff Velez.

17. After the City's budget was passed on June 30, 2020, without many of the reforms sought by the protesters in Abolition Park,[5] many community members, including Plaintiffs, remained to express dissatisfaction with the results and continue to demonstrate.  The community formed an "occupy" protest and conducted ongoing activities to advocate for issues about which the protesters were passionate.  Advocates had a continuous presence at Abolition Park for at least a month.[6]

18. Plaintiffs were part of the community that maintained a long-term presence at the park.[7] This allowed for them to put constant pressure on the nearby New York City government while exercising their First Amendment rights.  Over time, Plaintiffs and others gathered a range of personal and shared items at Abolition Park.

19. Advocates created processes and teams to manage sanitation, mental health crises, and other health and safety concerns for the park community.

20.  Police maintained a continuous presence surveilling the community members in the park.  Struggles occasionally occurred between protesters and officers or between

---

[5] Dana Rubinstein and Jeffery C. Mays, *Nearly $1 Billion Is Shifted From Police in Budget That Pleases No One*, N.Y. TIMES (Aug. 10, 2020), https://www.nytimes.com/2020/06/30/nyregion/nypd-budget.html.
[6] Guerguerian, *supra* note 4 ("On June 23, a week before the city's 2021 budget was to be decided by the City Council, Black Lives Matter activists, largely organized by racial and economic justice advocates with VOCAL-NY, began camping in the park").
[7] Chung et al., *supra* note 1.

members of the Abolition Park community.  Nevertheless, for many of the community members, the park provided a safe haven to advocate and discuss ideas away from the risk of mistreatment by law enforcement, and a space away from the dangers and uncertainty of being isolated elsewhere in the City.[8]

21. The City decided to abruptly end the continuous presence of protesters in a prominent and visible location in downtown Manhattan.  After purported weeks of planning, at about 10 p.m. on July 21, 2020, Defendant Mayor DeBlasio approved an operation to forcibly remove the community members present in Abolition Park.[9] Defendant Commissioner Shea consulted in the decision.[10]

22. The decision to forcibly remove protesters without notice did not appear to be sparked by any particular event or exigent circumstance.[11]  Rather, the City's actions

---

[8] Jake Offenhartz and Gwynne Hogan, *NYPD Officers Rough Up Protesters Occupying City Hall In Show Of Force Before Budget Vote*, GOTHAMIST (June 30, 2020), https://gothamist.com/news/nypd-officers-rough-protesters-occupying-city-hall-show-force-budget-vote; Gwynne Hogan, *For New Yorkers Who Need Food And Shelter, "Abolition Park's" Police-Free Zone Feels Like Home*, GOTHAMIST (July 8, 2020), https://gothamist.com/news/for-new-yorkers-who-need-food-and-shelter-abolition-parks-police-free-zone-feels-like-home.

[9] Lindsay Tuchman, Rocco Vertuccio, & Shannan Ferry, *NYPD Breaks Up Occupy City Hall Encampment*, SPECTRUM NEWS (July 22, 2020), https://www.ny1.com/nyc/all-boroughs/news/2020/07/22/nypd-breaks-up-occupy-city-hall-encampment.

[10] Shant Shahrigian, Esha Ray, Rocco Parascandola, Thomas Tracy, & Larry McShane, *NYPD clears out monthlong Occupy City Hall encampment, makes one arrest in largely peaceful eviction*, DAILY NEWS (July 22, 2020), https://www.nydailynews.com/new-york/nyc-crime/ny-nypd-clears-out-occupy-city-hall-20200722-qb32vjlxczgsrgu4lg4eb7c7pa-story.html (reporting "Mayor de Blasio collaborated with Shea in making the decision").

[11] Chung et al., *supra* note 1 (reporting Mayor de Blasio claimed the occupation was "more and more about homeless individuals who have gathered there" as justification for the park's clearing).

were in response to the protest's message, location, and persistent presence. Commissioner Shea, for instance, had expressed the need to "deal[] with" "anti-police rhetoric."[12]

23.  Police officers made statements before and during the raid that suggest animus for the content of the protestors' speech.  Approximately two days prior to the raid, one officer told Plaintiff Velez that the protestors could "laugh now" while they still could, leaving open a menacing implication of what would happen to them later.  In addition, Plaintiff McGill overheard officers making comments to the effect of Abolition Park protestors had "no respect" while she saw them destroy the Park members' belongings during the raid.

24. Despite the lack of any imminent concern that would call for immediate action, Defendants, including Defendant de Blasio, Defendant Shea, and Defendant Spinella, determined to conduct the operation as a middle-of-the-night raid, where police would storm the park without advance notice while protesters slept.  Around 3 a.m. on July 22, 2020, police amassed in larger-than-normal numbers, turned on floodlights, and began to prepare for the raid.

---

[12] Amanda Woods, *Dermot Shea Slams Washington Square Park Mayhem as 'Abhorrent Behavior'*, N.Y. POST (June 15, 2021), https://nypost.com/2021/06/15/dermot-shea-slams-abhorrent-behavior-at-washington-square-park/ (regarding another protest with "[a]nti-police rhetoric, including 'Cops Kill,'" Shea responded: "'You know, I view this as a little different from just about the park . . . It's [also] about . . . in my view, normalizing, you know, abhorrent behavior. And whether it's in a park or anywhere else, ultimately it's going to have to be dealt with.'")

25. At approximately 3:40 a.m. the forced removal began.  Armed police carrying shields and wearing riot gear advanced on the park where activists and community members, mostly sleeping, were gathered.  Plaintiffs and many of the park's other residents, including those who were awake, had no warning.

26. Plaintiff Velez was not present at Abolition Park at the time of the raid and had no opportunity to safeguard her belongings.  Plaintiff McGill was present at Abolition Park, but was in the restroom at the time NYPD arrived and heard no warning. Nothing else was done to give those present advance notice of the need to protect or remove their belongings.

27. Fear and chaos quickly arose as the police stormed into the park.  Community members—many of whom had been abruptly startled awake—did not know what to do or what was happening.  To avoid arrest or the risk of police violence, most left the park immediately.  Residents had no time to gather and secure their belongings.  Most possessions, including everything from basic necessities to deeply personal mementos, remained exactly where they were.  Exhibit 1, Photos and Video Stills of Abolition Park Clearing.

28. Having just returned from the restroom, Plaintiff McGill saw that police officers in riot gear had entered the park.  Despite her best efforts, she was unable to collect her belongings before the approaching officers forced her to leave.  This included her ring containing her grandfather's ashes and other treasured possessions.

29. Plaintiff Velez was at home when police conducted the raid on Abolition Park. She was awakened by messages from others who had been in the park to notify her of what was occurring. Plaintiff Velez left her home at approximately 4 a.m. to pick up individuals in her car who had been displaced from the park and needed assistance getting to a safe location.

30. Once most of the protesters, including Plaintiff McGill, had been forced out of the park, the police, along with other City employees like sanitation workers, set about seizing and disposing of protesters' property.[13] No effort was made to return items to their owners on the scene, despite a collection of community members remaining on the other side of the barricade. Instead, garbage trucks arrived at the park, and City workers disposed of personal items by throwing them into the trucks. The community members of Abolition Park watched as their belongings were mashed by the machinery of the sanitation trucks.

31. Officers discarded personal belongings indiscriminately, and Plaintiff McGill saw this firsthand. She stayed on the periphery of the park until about 7 a.m. and observed an officer use a blade to slash and destroy dozens of water bottles kept for community members. In hopes of retrieving her ring containing her grandfather's ashes, Plaintiff McGill returned to Abolition Park later on in the day. Officers present there told Plaintiff McGill that all of the items within the park were being thrown out

---

[13] Chung et al., *supra* note 1 (including video of NYPD officer taking a saw to the protestor's property and city officials then loading these items into the garbage truck).

and there was nothing that she could do.  Plaintiff McGill later called One Police Plaza and other precincts in hopes of learning how to regain her property, but no one had an answer.  Plaintiff Velez, from a distance, saw police and sanitation workers destroying property.

32. Among the property seized, disposed of, or destroyed by City employees were clothing, backpacks, speakers, phones, and laptops, as well as personal mementos such as jewelry, a Quran, legal papers, and a bike.

33. Plaintiffs lost several items of deep significance.  For instance, Plaintiff McGill was dispossessed of her college ring containing her grandfather's remains, as well as many other cherished items, such as a childhood stuffed animal, government and work identification documents, and clothing.  The destruction of Plaintiff McGill's property resulted in the interruption of her employment and the hours because she did not have her employment card or personal ID.  Plaintiff Velez lost tutoring materials, an electronic tablet, a watch, headphones, and chairs.

34. Defendant Chief Spinella and Doe Defendants assisted with the implementation of the Abolition Park raid and facilitated the unlawful destruction of Plaintiffs' property.[14]  NYPD gave virtually no notice, if any, in the middle of the night so that the members of Abolition Park exercising their freedom of speech would be awoken, caught off guard, and have little time to react and gather their belongings.  Defendant

---

[14] Shahrigian et al., *supra* note 10 (noting "Spinella said the park would remain on lockdown" and described clearing efforts).

Edward Grayson facilitated the unlawful destruction of Plaintiff's property by providing Department of Sanitation trucks for the removal and destruction of property.[15]   No procedures were implemented in the process of discarding the belongings, nor in the aftermath.  No notification was given to Plaintiffs for how to find and collect their lost items.  Plaintiff Velez lost property collectively valued at $660, and Plaintiff McGill lost property with a value of $591.50.

35. The City negligently trained or failed to supervise city officials in the handling of protestors' property, which led to the property destruction and sent a chilling message to the protestors.  No Defendant provided any information or instructions to either Plaintiffs or the other community members who had been present at Abolition Park about how to get back their belongings.  Police officers on the scene did not issue property vouchers.  No communications or public statements were made by the City to inform people that they could submit a request to retrieve their property.[16]   No communication was given regarding their property.

36.  Plaintiff McGill and Plaintiff Velez submitted notices of claims on October 18 and 19, 2020, respectively.  Plaintiffs each received acknowledgment of their claims from the Office of the Comptroller, correspondingly, on October 19 and 20, 2020.

---

[15] Feuer and Kim, *supra* note 1; Chung et al., *supra* note 1.
[16]    NYPD, *Return of Property (Other than a Vehicle)*, https://www1.nyc.gov/site/nypd/services/vehicles-property/return-of-property.page (last visited Oct. 20, 2021).

37. On September 14, 2021, Plaintiffs submitted a request to New York City officials to disclose the names of specific individuals who were present and participated in the seizure and/or disposal of property at Abolition Park on July 22, 2020.  Exhibit 2, Letter New York City Officials.  Plaintiffs have not received a reply.

38. To date, the City has not responded to Plaintiffs' claims.  Plaintiffs McGill and Velez have not had their property returned, nor have they received compensation for their possessions.

39. This lawsuit accordingly seeks to vindicate Plaintiffs' constitutional and common law rights to property, which were violated by Defendants.  Plaintiffs seek to ensure that they are fairly compensated for the destruction of their property or, in the unlikely event these items have been stored, that their possessions are returned.

## CLAIMS FOR RELIEF

### Count 1: Procedural Due Process
### U.S. Const. amend. XIV, § 1; 42 U.S.C. § 1983

40. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.  Defendants' conduct infringed on Plaintiffs' procedural due process rights in violation of the Fourteenth Amendment of the United States Constitution.

41. The Due Process Clause requires "that individuals must receive notice and an opportunity to be heard before the Government deprives them of property." *United*

*States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993); U.S. Const. amend. XIV, §

1; 42 U.S.C. § 1983.

42. Defendants have violated Plaintiffs' procedural due process rights by removing

and withholding and/or disposing of their property without providing adequate notice.

Defendants gave little to no warning and insufficient opportunity for Plaintiffs to collect

and remove their belongings before seizing and withholding and/or destroying them.

Defendants did not provide property vouchers, inform Plaintiffs of a retrieval process

for their items, or make any other efforts to allow Plaintiffs to obtain their property.

43. Plaintiffs were not provided adequate notice or the opportunity to be heard, nor

were they able to retrieve their items or obtain them at a later time through the City's

property recovery process or by other means.  Since filing notice of claims in October

2020, the Comptroller's Office has provided no substantive update regarding its

investigation, has not requested additional information from Plaintiffs, and has not

offered compensation for the discarded property.

44. Defendants failed to provide adequate process, both pre- and post-deprivation.

45. Both Plaintiff Jada McGill and Plaintiff Angie Velez suffered harm from the loss

and/or destruction of their property without notice or the opportunity to retrieve such

property.  They lost belongings that had monetary value as well as personal mementos

that are in many ways, irreplaceable. Both Plaintiffs are not only unable to utilize and

avail themselves of the property that was seized and destroyed, but also have not

received compensation for the seized items.  As a result of Defendants' taking and/or

destruction of Plaintiffs' property, Plaintiff Jada McGill lost irreplaceable personal mementos and property with a total monetary value of approximately $591.50, and Plaintiff Angie Velez lost a range of educational items with a total monetary value of approximately $660.

### Count 2: Unreasonable Seizure
### U.S. Const. amend. IV; 42 U.S.C. § 1983

46. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.  Defendants' conduct as set forth in the Complaint is impermissible under the Fourth Amendment of the United States Constitution.

47. Plaintiffs have a right to be free from unreasonable searches and seizures that meaningfully interfere with their property interests.  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); U.S. Const. amend. IV; 42 U.S.C. § 1983.  Even if a seizure is "lawful at its inception," it may become unreasonable through "its manner of execution," such as by destroying the seized property.  *Jacobsen*, 466 U.S. at 124.

48. Defendants' interference with Plaintiffs' fundamental property rights through the seizure and withholding or destruction of Plaintiffs' possessions without warning or opportunity to secure and withdraw their belongings violated the Fourth Amendment.

49. Both Plaintiff Jada McGill and Plaintiff Angie Velez suffered harm from the loss and/or destruction of their property without the opportunity to retrieve such property, as detailed in Paragraph 45 of this complaint.

*Count 3: Retaliation*
*U.S. Const. amend. I; 42 U.S.C. § 1983*

50. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.  Plaintiffs had a protected First Amendment interest in the activities occurring at Abolition Park because they were (1) speaking as citizens and (2) assembled with fellow protestors to engage in expressive conduct.  *See generally Black Lives Matter v. Town of Clarkstown*, 354 F. Supp. 3d 313 (S.D.N.Y. 2018).

51. Defendants' abrupt raid of the park without notice constitutes unlawful retaliation because Defendants' actions were motivated or substantially caused by the exercise of Plaintiffs' constitutionally-protected expression.  *See Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).  Suffering tangible harm as a result of retaliation by state actors for protected expression is a violation of an individual's First Amendment rights. *See, e.g., Zherka v. Amicone*, 634 F.3d 642, 646 (2d Cir. 2011).  As a result of Defendants' retaliatory actions, Plaintiffs suffered harm, including the tangible loss and/or destruction of their personal property.

52. Defendants' violation of Plaintiffs' First Amendment rights by raiding Abolition Park in retaliation for constitutionally-protected expression harmed Plaintiffs McGill

and Velez, resulting in the loss of Plaintiffs' treasured belongings valued as described in Paragraph 45 of this complaint.

*Count 4: Municipal Liability*
*Pursuant to 42 U.S.C. § 1983 and Monell v. Dept. of Social Serv., 436 U.S. 658*
*(1978) for Defendants' Violations of Plaintiffs' Rights Under the U.S.*
*Constitution and Pursuant to the Doctrine of Respondeat Superior for*
*Violations of Plaintiffs' Rights Under New York Law*
*Against Defendant City of New York*

53.   Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

54. Defendants de Blasio, Shea, Spinella, and Grayson were high-level officials who were responsible for establishing, and who did establish, final policy for Defendant City of New York with respect to the decisions to seize and destroy Plaintiffs' property without cause and without providing appropriate pre- or post-deprivation notice or opportunity to be heard.

55. Defendant City of New York is therefore liable for the harms caused by those Defendants and subordinate officers in implementing those final policies, including, but not limited to, the violations of Plaintiffs' rights complained of herein.

56.   Additionally, Defendants failed to train and supervise their officials, employees, and agents, so as to prevent the seizure and destruction of Plaintiffs' property, which resulted in the violation of the First, Fourth, and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983.

57.   The deficiency in the training and supervision of Defendants was an actual cause of the constitutional deprivations and injuries suffered by Plaintiffs. *See Amnesty Am. v. Town of West Hartford*, 361 F. 3d 113, 118 (2d Cir. 2004) (holding police chief's failure to intervene when officers used excessive force during protest demonstrations created an issue of material fact as to whether the town failed to supervise its police force); *Marlin v. City of N.Y.*, No. 15-cv-2235, 2016 WL 4939371 (S.D.N.Y. Sept. 7, 2016) (declining to dismiss plaintiff's failure to train claim when it was shown police had previously used excessive force several times throughout a five year period).

58. With respect to Count 5 and Count 6 below, the conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

### Count 5: Conversion
### Pursuant to New York State Law

59.  Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.  Under New York law, conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.  *Thyroff v. Nationwide Mut.*

*Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2007).  Conversion also applies to the destruction of property.  *Id.* at 404.

60.  At all relevant times, Plaintiffs were and continue to be the sole rightful owners of the property sought in their respective claims to the Comptroller's Office. Defendants, by their wrongful acts, took Plaintiffs' possessions.  Plaintiff McGill's ring, passport, work ID, childhood stuffed animal, clothing, and tent belonged and belongs to no other individual but herself.  Similarly, Plaintiff Velez's educational items and personal property belonged and belongs to no other individual but Plaintiff Velez. Defendants took control of Plaintiffs' personal property without consent and continue to withhold it or disposed of it, thereby interfering with Plaintiffs' possessory interests.

61.  As a direct and proximate result of Defendant's wrongful conversion of Plaintiffs' assets, Plaintiffs McGill and Velez have suffered harm as a result of being denied their property, as described in Paragraph 45 of this complaint.

62.  Pursuant to 28 U.S.C. § 1367, this court has pendant or supplemental jurisdiction to hear and adjudicate such claims.

### Count 6: Trespass to Chattel
### Pursuant to New York State Law

63.  Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

64. A person who interferes with the possessions of another is liable for trespass to chattel. *See Fischkoff v. Iovance Biotherapeutics, Inc.*, 339 F. Supp. 3d 408, 416 (S.D.N.Y. 2018).[17]

65. At all relevant times, Plaintiffs were and continue to be the sole rightful owners of the property. Plaintiffs intended to return to their property and continue their use of their treasured belongings. These belongings included Plaintiff McGill's ring, passport, work ID, childhood stuffed animal, clothing, and tent. It also included Plaintiff Velez's educational items and personal effects. Neither Plaintiff McGill nor Plaintiff Velez consented to the City's taking and/or disposal of Plaintiff's belongings. Defendants, by their wrongful acts, interfered with Plaintiffs' use and enjoyment of their property.

66. As a direct and proximate result of Defendants' wrongful trespass to chattel, Plaintiffs suffered harm from being unable to use and enjoy their property, as described in Paragraph 45.

67. Pursuant to 28 U.S.C. § 1367, this court has pendant or supplemental jurisdiction to hear and adjudicate such claims.

---

[17] The "denial or violation of the plaintiff's dominion, rights, or possession" gives rise to a conversion claim, whereas the "[i]nterference with a person's property constitutes a trespass." *Sporn v. MCA Recs., Inc.*, 58 N.Y.2d 482, 487 (1983). Plaintiffs were dispossessed of their property before its conversion and ultimate destruction. In the unlikely event that Plaintiffs' belongings have been stored, the NYPD's failure to return such items in a timely fashion when requested would constitute a continuing trespass. *Cf. id.* at 488.

## JURY TRIAL DEMAND

68. Plaintiffs demand a jury trial on each and every claim related to which a jury trial is available.

## PRAYER FOR RELIEF

Wherefore Plaintiffs request that the Court:

a. Declare that Defendants' conduct as alleged in the Complaint violates Plaintiffs' rights under

    i. The Fourteenth Amendment to the United States Constitution;

    ii. The Fourth Amendment to the United States Constitution;

    iii. The First Amendment to the United States Constitution;

    iv. New York's tort of conversion; and

    v. New York's tort of trespass to chattel;

b. Award compensatory damages for the value of Plaintiffs' lost property;

c. Award punitive damages for Defendants' outrageous conduct and reckless disregard of Plaintiffs' rights;

d. Award Plaintiffs' reasonable attorney's fees and costs; and

e. Grant any further relief that the Court may deem just and proper.


Dated: October 20, 2021

                          Respectfully submitted,

                          Seth Wayne*

Institute for Constitutional Advocacy
and Protection (ICAP)
Georgetown University Law Center
600 New Jersey Ave. NW
Washington, D.C. 20001
Tel: 202-662-9042
sw1098@georgetown.edu

Jennifer Safstrom*
Civil Rights Clinic (CRC)
Georgetown University Law Center
600 New Jersey Ave. NW, Suite 352
Washington, D.C. 20001
Tel: 202-661-6629
jsafstrom@georgetown.edu

Elena L. Cohen
J. Remy Green
Cohen & Green, PLLC
1639 Centre St., STE 216
Ridgewood, New York, 11385
Tel: 929-888-9650
elena@femmelaw.com
remy@femmelaw.com

Gideon Oliver
277 Broadway STE 1501
New York, New York, 10007
Tel: 718-783-3682
gideon@gideonlaw.com

Attorneys for Plaintiffs

*Pro Hac Vice application forthcoming.